**Wendy W. WISE, Plaintiff,**

v.

**KIDDER PEABODY & CO., INCORPORATED, a Delaware corporation, and William H. McCoy, II, Defendants.**

Civ. A. No. 84–89 LON.

United States District Court, D. Delaware.

Oct. 31, 1984.

Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, Del., for plaintiff.

Roderick R. McKelvie, Ashby, McKelvie & Geddes, Wilmington, Del., for defendants.

## OPINION

LONGOBARDI, District Judge.

This case is a securities action in which the Plaintiff, Wendy W. Wise ("Mrs. Wise"), alleges that the Defendants, Kidder Peabody & Co., Incorporated ("Kidder Peabody"), and its broker, William H. McCoy, II ("McCoy"), are liable for violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Delaware law. Jurisdiction arises under 15 U.S.C. § 78aa.

The case is presently before the Court upon the Defendants' motion for summary judgment on the securities act claim and, in the alternative, Defendants' motion to compel arbitration. Because relevant facts remain in dispute, the summary judgment motion is denied. The motion to compel arbitration is also denied.

### Background

In her complaint, Mrs. Wise alleges that during the period from June, 1981, through the Spring of 1982, McCoy, a Kidder Peabody broker, fraudulently induced her to purchase Puritan Fashions ("Puritan") stock. Wise alleges that McCoy violated section 10(b) of the Exchange Act by making three statements without reasonable basis in fact: (1) that Puritan's stock would increase in price from approximately $20 per share to approximately $32 per share; (2) that Puritan was about to announce a merger; and (3) that a source close to Puritan's president had confirmed the merger. As far as the Court can determine from the record, the facts which led to these allegations are as follows.

McCoy began working as Mrs. Wise's broker in early 1980 when she decided to seek professional advice concerning a portfolio of securities she had inherited. McCoy was chosen at the suggestion of Mrs. Wise's husband, Alex, with whom McCoy had been friends for a number of years. Initially, McCoy made some adjustments in the holdings consistent with Mrs. Wise's desire to change the portfolio to achieve "modest capital appreciation with income."

The events in question began on June 12, 1981, over a year after McCoy had begun work for Mrs. Wise. On that afternoon, he telephoned Alex Wise to recommend that Mrs. Wise purchase Puritan Fashions securities. Mr. Wise accepted the recommendation and on his instruction McCoy then purchased 500 shares of Puritan at 21¾ for Mrs. Wise's account.[1] The next day McCoy attended a cocktail party at the Wises' and spoke with Mrs. Wise about the Puritan stock. On Monday, he bought an additional 1,000 shares of Puritan for Mrs. Wise's account. These purchases on June 12 and June 15, 1981, made Puritan the largest single security in her portfolio in terms of the number of shares and in the amount of cash investment. In addition, the purchase was on margin and required Mrs. Wise to borrow over $35,000 to make the transaction.

Unfortunately, the Puritan investment did not turn out as the Wises had hoped. After the initial purchase, the stock began a downward slide and by July of 1981, had fallen over 5 points. When the stock rose slightly in August, Mr. Wise decided to "cover his losses" by selling a large amount of Columbia Gas stock and buying an additional 500 shares of Puritan. After that purchase, the stock hovered between 16 and 19 for a few months and, in November, the Wises bought an additional 1,000 shares at 15⅞ in order to "average down." This purchase was not recommended by McCoy.

---

1. It should be noted that although the stocks which are the subject of this lawsuit were owned by Wendy Wise, her husband, Alex Wise, was involved in the management of her portfolio.

By June of 1982, the stock had declined to 11⅜. At that point, the Wises gave up on the investment and decided to tender the stock in response to a debenture offer which had been made by the company in February. On July 21, Mrs. Wise sold 2,000 shares at $8 a share and on July 23, sold the balance of the stock at $8.25 a share. She received May, 1997 debentures with a face value of $15,300 at 16%. The debentures were sold in the fall. The loss on the Puritan holdings totaled $33,000.

### Summary Judgment

■ The Defendants have moved for summary judgment on the Wises' federal claim. Rule 56(c) of the Federal Rules of Civil Procedure provides that, upon motion of a party, summary judgment shall be rendered if the record indicates there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In determining whether summary judgment is appropriate, all the evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Where an issue of fact is not susceptible to direct evidence but may be resolved by drawing an inference from circumstantial evidence, the court may not draw an inference favorable to the moving party unless no other inference is possible. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982). Thus, issues relating to the mental state of a person, always a matter of inferences, are usually decisions for the jury and are rarely decided on summary judgment. *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

Despite this difficult standard, the Defendants state they are entitled to summary judgment on two grounds. They assert that the facts demonstrate McCoy did not act with the scienter necessary to sustain a 10b–5 claim and, even if the necessary scienter could be established, Mrs. Wise's recovery is barred by the doctrine of *in pari delicto*.

■ The elements necessary to prevail on a Rule 10b–5 claim include knowledge by the defendants, intent to defraud (scienter), misrepresentation or nondisclosure, materiality of the facts and, in some instances, reliance by the plaintiff. *Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 583 (3d Cir.1975); *Seiler v. E.F. Hutton & Co., Inc.*, 584 F.Supp. 607, 611 (D.N.J.1984). Exactly what may constitute the scienter necessary for liability under section 10(b) has evolved considerably in recent years. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court suggested that recklessness could be enough for liability in a section 10(b) action, yet left the question open for review.

> [T]he term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.

425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12.

■ Since *Hochfelder*, the Third Circuit and other Courts of Appeals have concluded that reckless conduct is actionable under section 10(b). *McLean v. Alexander*, 599 F.2d 1190 (3d Cir.1979). In *McLean*, the Third Circuit specifically defined the standard of recklessness to be applied.

> [R]eckless conduct may be defined as . . . highly unreasonable [conduct] involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 1197, quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.), *cert. denied*, 434 U.S. 875, 98

S.Ct. 224, 54 L.Ed.2d 155 (1977). Clearly, negligence cannot serve as a substitute for scienter. An individual may be liable for reckless conduct, however, where the conduct presents an obvious danger of misleading buyers of which he *should* have been aware. *Id.*

Whether an individual's actions meet the *McLean* standard is difficult to determine on summary judgment. Intent is a question of fact involving so many intangible factors that it is not easily resolved as a matter of law. *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). In this case, the fact finder must examine the bases upon which McCoy made his recommendation to purchase Puritan stock in order to determine whether his statements were so obviously misleading as to create liability under section 10(b). The depositions indicate a serious factual dispute as to what McCoy relied upon in making his recommendation. Mr. and Mrs. Wise have testified that they believe he relied upon inside information. On the other hand, McCoy has testified that he never had an inside source nor did he ever represent that he had such a source to either of the Wises.

In light of this dispute, the Court finds it impossible to determine as a matter of law that McCoy's recommendation was obviously misleading. A jury could find that the Defendant had acted reasonably and had done nothing to mislead the Plaintiff. On the other hand, a jury could conclude that McCoy made statements with no basis in fact and misled the Plaintiff or that he acted so recklessly that he knew or should have known Mrs. Wise would have been misled. The resolution of such factual disputes are best left to a fuller development and resolution at trial. Thus, the Defendants' first ground for summary judgment is denied.

Regardless of any factual disputes, the Defendants argue they are entitled to summary judgment because the Plaintiff is barred from recovery by the doctrine of *in pari delicto*. The defense of *in pari delic-to* may be invoked by a defendant when the party seeking relief is involved in the wrongdoing. Proper application of the doctrine requires that the guilt of the parties be approximately equal. *Tarasi v. Pittsburgh Nat. Bank*, 555 F.2d 1152 (3d Cir. 1977). In this case, the Defendant claims that if he is guilty of wrongdoing, Mrs. Wise is as guilty as he since she purchased the stock in the belief that he had privileged inside information.

In asserting that *in pari delicto* should prohibit the Plaintiff's recovery, the Defendants rely upon *Tarasi v. Pittsburgh Nat. Bank*, 555 F.2d 1152. In *Tarasi*, the Third Circuit held that a tippee is barred from bringing suit against a tipper who had allegedly supplied false information when the tippee willingly committed illegal acts by using the information. As the Plaintiff points out, however, the *Tarasi* opinion must be reevaluated in light of two subsequent Supreme Court opinions on insider trading liability, *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Dirks v. S.E.C.*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). In *Chiarella*, the Court held that a financial printer who gained information about a takeover bid from documents delivered to him to be printed and then bought stock without disclosing the information was not liable under section 10(b) of the Act. The Court found that section 10(b) liability is premised upon an initial duty to the shareholders. The printer had no such duty.

> No duty could arise from petitioner's relationship with the sellers of the target company's securities, for petitioner had no prior dealings with them. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions.

*Id.* 445 U.S. at 232–33, 100 S.Ct. at 1117. Thus, section 10(b) is not always violated whenever any individual uses non-public market information in buying stocks. *Id.*

In *Dirks*, the Court held that absent a duty owed to the stockholders by the insider, a tippee does not violate the insider trading laws. "[T]he test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. *And absent a breach by the insider, there is no derivative breach.*" 103 S.Ct. at 3265. (Emphasis added).

█ The *Dirks* standard must be applied to determine the liability of tippees (or remote tippees as we have in the present case). *Schick v. Steiger*, 583 F.Supp. 841, 874 (E.D.Mich.1984). Application of that standard in this case clearly indicates that *in pari delicto* cannot apply as a matter of law. The existence of a corporate insider in this case has not even been demonstrated. Thus, applying the *Dirks* standard, it is clearly impossible to make any determination as to the liability of the remote tippee where the duty of the insider has not been established. Since no initial breach of an insider's duty has been shown, Wendy Wise, as a remote tippee, has not violated the securities laws and cannot be barred from recovery by *in pari delicto*. *Id.* The Defendants' second ground for summary judgment is also denied.

### Motion to Compel Arbitration

The complaint alleges federal Securities Act violations and contains a number of pendent state claims alleging violations of Delaware law. The Defendants have moved to stay the proceedings on the state claims until after the federal claims have been resolved and at that time have the state claims submitted to arbitration.

The motion to compel arbitration arises from a customer's agreement executed between Wendy Wise and Kidder Peabody. The agreement contained an arbitration clause which stated in part:

Any controversy arising out of or relating to accounts or transactions with or for the undersigned or to this agreement or the breach thereof shall be settled by arbitration in accordance with the rules of either the American Arbitration Association or the New York Stock Exchange as the undersigned may elect. If the undersigned does not make such election be [sic] registered mail addressed to you at your main office in New York City within five days after demand by you that such election be made, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

█ Assuming the customer's agreement to be a valid contract, this provision must be enforced by the courts pursuant to Section Two of the United States Arbitration Act: "A written provision in any ... contract ... involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for a revocation of any contract." 9 U.S.C. § 2 (1976). There are, however, a few well recognized exceptions to this general policy. In particular, the Supreme Court has held that violations of the Securities Act of 1933 are not subject to arbitration.[2] *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In *Wilko*, the Court found that the protective nature of the Securities Act outweighs the policies promoted by arbitration.

[Congress] has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights. Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the inten-

---

**2.** Unlike the *Wilko* claims which arose under the Securities Act of 1933, the claims in this case arise under section 10(b) of the 1934 Securities Exchange Act. However, the acts are similar in purpose and courts have consistently held that agreements to arbitrate claims arising under section 10(b) of the 1934 Act are also unenforceable. See, *e.g., Sibley v. Tandy Corp.,* 543 F.2d 540, 543 (5th Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *Greater Continental Corporation v. Schechter,* 422 F.2d 1100, 1103 (2d Cir.1970).

tion of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the act.

*Wilko,* 346 U.S. at 438, 74 S.Ct. at 188–89 (footnotes omitted).

Since the *Wilko* decision, courts have been faced with the problem of what to do when arbitrable claims are joined with claims not subject to arbitration. There is no evidence that Congress considered this issue in enacting the Arbitration Act. *Cunningham v. Dean Witter Reynolds, Inc.,* 550 F.Supp. 578, 583 (E.D.Cal.1982). Nor has the Third Circuit given any guidance on this problem.[3] Thus, it is necessary to weigh the policies of the Arbitration Act and the Exchange Act in light of the facts presented in order to determine whether enforcement of the arbitration clause is proper in this case.

The Defendants argue that the Arbitration Clause must be enforced and the state claims stayed pending resolution of the Exchange Act claim and then arbitrated in the usual manner. The Plaintiff urges the Court to evaluate the extent to which the federal and state claims are factually "intertwined" before separating the claims and, if the degree of factual similarity is substantial, to consolidate all claims to be heard in federal court. The Plaintiff's approach, known as the doctrine of "intertwining", originated in the Fifth Circuit in *Sibley v. Tandy Corp.,* 543 F.2d 540 (5th Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977), and has been adopted in two other circuits. *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023 (11th Cir.1982); *Byrd v. Dean Witter Reynolds, Inc.,* 726 F.2d 552 (9th Cir.), *cert. granted,* —— U.S. ——, 104 S.Ct. 3509, 82 L.Ed.2d 818 (1984).

In *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318 (5th Cir.1981), the Fifth Circuit discussed the reasons for consolidating federal and state claims into one when the facts are inseparably intertwined.

In *Sibley,* Judge Godbold noted that "when it is impractical if not impossible to separate out non-arbitrable from arbitrable contract claims, a court should deny arbitration in order to preserve its exclusive jurisdiction over federal securities act claims." Additionally, the court in *Sibley* noted that arbitration should not be ordered where "[a]n arbitrator making a decision on the common law claims would [be] impelled to review the same facts needed to establish the plaintiff's securities law claim."

637 F.2d at 335 (citations omitted).

Admittedly, Judge Godbold's first concern, that of preserving federal jurisdiction, is not as important in a case such as this where the Defendants ask that the state claims be stayed pending resolution of the federal causes of action. However, the second concern, that two forums may end up reviewing the same facts if state claims are arbitrated, is a most compelling reason to adopt the doctrine of intertwining. Efficiency must always be a concern of the courts and, when a procedure promotes efficiency at little or no expense to the parties, it should be utilized.

It is decidedly more efficient to hear both state and federal claims in one forum when the facts behind all the claims are substantially similar. Indeed, to do otherwise would "frustrate the purpose of the Arbitration Act, i.e., fast, inexpensive dispute resolution." *Byrd v. Dean Witter Reynolds, Inc.,* 726 F.2d at 554. When a suit involving the same factual issues is split into two separate proceedings, the expressed congressional policy of saving time and expense in litigation is defeated. *Cunningham,* 550 F.Supp. at 584.

**3.** The Plaintiff cites *Ayres v. Merrill, Lynch, Pierce, Fenner & Smith,* 538 F.2d 532 (3d Cir. 1976), as evidence that the Third Circuit would apply the doctrine of intertwining. That is not so. The issue in *Ayres* was whether an arbitration agreement applied to allegations of security fraud. The Third Circuit simply applied the proposition accepted by both the Plaintiff and Defendants in this case that allegations of section 10(b) violations are not subject to arbitration. The Court did not decide whether state claims should be stayed pending resolution of the securities claims.

Ironically, in rejecting the intertwining doctrine in *Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638 (7th Cir.1981), the Seventh Circuit determined that intertwining did not give appropriate weight to the federal policies embodied in the Arbitration Act. *Id.* at 645. However, a close examination of those policies reveals that efficiency was the Act's ultimate goal. The Senate Report on the Act states: "The desires to avoid the delay and expense of litigation persists. The desire grows with time and as delays and expense increase." *Cunningham v. Dean Witter Reynolds, Inc.*, 550 F.Supp. at 584, quoting S.Rep. No. 536, 68th Cong., 1st Session, 3 (1924). Thus, the policy behind the arbitration act is advanced, not defeated, when efficiency is served.

Inefficiency is not the only concern if state claims are separated for arbitration proceedings. As the Fifth Circuit pointed out in *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d at 336–37, arbitration creates incentives for plaintiffs to drop one set of claims in order to speed collection on the judgment. If state proceedings are stayed, the plaintiff could be forced to endure a long arbitration procedure before recovery even though the fact finder has already concluded that federal securities laws have been violated. Indeed, as Judge Godbold speculated in *Miley*, a plaintiff might choose to abandon his state claim in order to immediately collect judgment upon conclusion of his federal trial, thereby undercutting the purpose of pendent jurisdiction. *Id., accord,* 550 F.Supp. at 584 n. 7.

This Court chooses to apply the doctrine of intertwining in this case. Indeed, this case is the perfect example of a situation where the claims should not be argued in two separate forums. "When arbitrable and nonarbitrable claims are 'inextricably intertwined' ... the district court should deny arbitration ...." *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d at 1026. In making the determination as to what extent the claims are intertwined, the Court must ask whether it has been presented with a single recitation of fact as the source of all the alleged claims. *Sawyer v. Raymond, James & Associates, Inc.*, 642 F.2d 791, 793 (5th Cir.1981).

■ In this case, the Court is faced with a single recitation of fact. All of the claims as pleaded derive from essentially the same set of alleged wrongful acts by the Defendants. An arbitrator hearing the state claims would have to consider the same evidence as the federal court and would have to determine many of the same factual and legal questions. Thus, any severance and partial arbitration in this case would be inefficient and duplicative.[4]

For the foregoing reasons, the Defendants' motion to compel arbitration is denied.

---

4. The Court acknowledges that efficiency may be achieved through arbitration because of the special technical expertise of the arbitrators. *Dickinson,* 661 F.2d at 646. However, that is not necessarily true in the mixed claims situation faced here. A federal court trial followed by arbitration indicates that any technical issues would arise first at trial, preempting any application of expertise by the arbitrator. Moreover, it is not clear that technical expertise is necessary in this case involving the sort of fraud claim that courts regularly decide without experts. See, *Cunningham v. Dean Witter Reynolds, Inc.,* 550 F.Supp. 578, 585 (E.D.Cal.1982).